IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | CASE NO. CV419-231 |
| TT CLUB MUTUAL INSURANCE LTD., | ) ) ) | |
| Defendant. | ) ) | |
| TT CLUB MUTUAL INSURANCE LTD. | ) ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | ) ) ) | |
| Counterclaim Defendant. | ) ) | |

<u>O R D E R</u>

Before the Court is Plaintiff/Counterclaim Defendant Travelers Property Casualty Company of America's Motion for Summary Judgment (Doc. 25), and Defendant/Counterclaimant TT Club Mutual Insurance's Motion for Summary Judgment (Doc. 30). Both motions have been opposed. (Docs. 31, 38) For the following reasons, both motions are **GRANTED IN PART** and **DENIED IN PART**.

**BACKGROUND**[1]

I.   THE UNDERLYING LAWSUITS

This declaratory judgment action and the resulting counterclaims involve a priority of coverage dispute between two insurers regarding settlement payments made as a result of a serious motor vehicle accident. (Doc. 25, Attach. 2 at ¶ 1; Doc. 31, Attach. 1 at ¶ 1.) The underlying accident occurred on May 19, 2015, when a Georgia Freightways employee fell asleep at the wheel of his tractor-trailer while driving along Interstate-16 in Pooler, Georgia, and crashed into several vehicles. (Doc. 30, Attach. 10 at ¶ 1; Doc. 39 at ¶ 1.) The collision killed five people and seriously injured a sixth. (Doc. 30, Attach. 10 at ¶ 2; Doc. 39 at ¶ 2.)

Six lawsuits (the "Underlying Lawsuits") were filed in the State Court of Chatham County on behalf of the individuals killed or injured in the accident. (Doc. 30, Attach. 10 at ¶ 7; Doc. 39

---

[1] The relevant facts are taken principally from the parties' respective statements of undisputed material facts (Doc. 25, Attach. 2; Doc. 30, Attach. 10), and the responses thereto (Doc. 31, Attach. 1; Doc. 39). Pursuant to Federal Rule of Civil Procedure 56(e) and Southern District of Georgia Local Rule 56.1, all material facts not controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate. Where the parties offer conflicting accounts of the events in question, this Court draws all inferences and reviews all evidence in the light most favorable to the nonmoving party. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (citing Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011)).

at ¶ 7.) The Underlying Lawsuits initially included as defendants the truck driver; Georgia Freightways; and Great West Casualty Company ("Great West"), the motor carrier insurer for Georgia Freightways. (Doc. 30, Attach. 10 at ¶ 8; Doc. 39 at ¶ 8.) The plaintiffs in the Underlying Lawsuits later added CMA-CGM (America), LLC ("CMA"), a transportation and shipping company, as a defendant under the theory that CMA was liable for the accident because CMA had loaned or leased the intermodal container chassis involved in the accident to Georgia Freightways. (See, e.g., Doc. 30, Attach. 1 at 75-76; Doc. 30, Attach. 10 at ¶¶ 5, 9 Doc. 39 at ¶¶ 5, 9.)

Great West initially defended CMA in the Underlying Lawsuits pursuant to a $1,000,000 policy issued by Great West to Georgia Freightways ("the Great West Policy"). (Doc. 25, Attach. 2 at ¶ 3; Doc. 31, Attach. 1 at ¶ 3; Doc. 30, Attach. 3 at 4.) In addition to the coverage provided by the Great West Policy, CMA was insured under three policies relevant to this action. Travelers issued two of the policies: a Travelers Marine General Liability policy, policy number ZOL-14R96169-14ND, with a $1,000,000 liability limit (the "MGL Policy") and a Travelers Bumbershoot Policy, policy number ZOB-14R96157-14ND, with a $10,000,000 liability limit (the "Bumbershoot Policy").[2] (Doc.

---

[2] An XL Catlin Master Policy, policy number FR00008439LI15A, provided CMA with an additional €50,000,000 in coverage, which

25, Attach. 2 at ¶ 6; Doc. 31, Attach. 1 at ¶ 6.) TT Club issued the third relevant policy, a TT Club policy, certificate number 93572/2014/001, with a $30,000,000 limit ("TT Club Policy").[3] (Doc. 25, Attach. 2 at ¶ 6; Doc. 31, Attach. 1 at ¶ 6.)

Due to the severity of the claims in the Underlying Lawsuits, TT Club agreed to participate with Great West in CMA's defense, believing that the TT Club Policy would likely be reached if the Great West policy were the only other coverage available to CMA. (Doc. 30, Attach. 10 at ¶ 23; Doc. 30, Attach. 3 at 4.) At the time, TT Club contends it believed that the Great West policy was the only other insurance available to CMA. (Doc. 30, Attach. 10 at ¶ 22; Doc. 39 at ¶ 22.) TT Club agreed to pay 45 percent of the legal costs incurred during CMA's defense, with Great West paying the remaining 55 percent. (Doc. 30, Attach. 10 at ¶ 24; Doc. 39 at ¶ 24.)

On June 22, 2018, notice of the Underlying Lawsuits was tendered to Travelers for the defense and indemnity of CMA. (Doc. 30, Attach. 10 at ¶ 32; Doc. 39 at ¶ 32.) In response, Travelers

---

applied as excess coverage for the two Travelers Policies. (Doc. 30, Attach. 10 at ¶ 31; Doc. 39 at ¶ 31; Doc. 30, Attach. 3 at 115–116.) Neither party contends that this policy is reached irrespective of the priority of coverage between the relevant policies.

[3] The TT Club Policy was issued to CMA's parent company, CMA CGM SA, but it is undisputed that CMA is entitled to coverage under the TT Club Policy as a joint assured. (Doc. 30, Attach. 10 at ¶¶ 15–16; Doc. 39 at ¶¶ 15–16.)

issued a reservation of rights letter to CMA. (Doc. 30, Attach. 10 at ¶ 33; Doc. 39 at ¶ 33.) Travelers' letter acknowledged that the MGL Policy provided coverage for the Underlying Lawsuits under its Non-Owned and Hired Auto Endorsement but stated that the "coverage is solely excess of and does not contribute with any other insurance which may be applicable to the loss that is covered by the Endorsement." (Doc. 1, Attach. 2 at 6.) Travelers also informed CMA that the "Bumbershoot Policy is excess over the Primary Non-Owned and Auto Coverage." (Id.) Additionally, Travelers requested that CMA's assigned defense counsel include Travelers on their mailing list for all further updates on the Underlying Lawsuits. (Id. at 7.) Travelers maintained communications with CMA's defense counsel through the pendency of the Underlying Lawsuits; however, Travelers did not formally participate in CMA's defense and did not pay any of the defense costs incurred in CMA's defense. (Doc. 30, Attach. 10 at ¶¶ 36-37, 48; Doc. 39 at ¶¶ 36-37, 48.)

On September 10, 2019, representatives for Travelers and TT Club attended a global mediation of the Underlying Lawsuits. (Doc. 30, Attach. 10 at ¶ 38; Doc. 39 at ¶ 38.) The Underlying Lawsuits settled at mediation for $6,000,000 (the "Settlement"), with Great West paying the first $1,000,000.[4] (Doc. 30, Attach. 10 at

---

[4] The parties dispute in their briefs whether it was proper for TT Club to disclose the settlement amount due to a confidentiality

¶ 39; Doc. 39 at ¶ 39.) TT Club and Travelers agreed to fund the remaining $5,000,000 in equal shares while reserving their respective rights to seek contribution from the other. (Doc. 30, Attach. 10 at ¶ 40; Doc. 39 at ¶ 40.)

II.   PROCEDURAL HISTORY

On September 13, 2019, Travelers filed its Petition for Declaratory Judgment in this Court pursuant to 28 U.S.C. § 2201. (Doc. 1.) Travelers petitions the Court for a judgment declaring that the TT Club Policy is primary and applicable before either of Travelers' policies and that Travelers is entitled to contribution of any amounts paid towards the Settlement. (Id. at ¶ 28.) Alternatively, Travelers seeks a judgment declaring that the MGL Policy and TT Club Policy are co-primary and share funding of the Settlement on a pro-rata basis, with Travelers entitled to recover amounts paid to fund the Settlement in excess of the total applicable to the MGL Policy. (Id. at ¶ 29.) In response, TT Club brings counterclaims against Travelers for contribution and/or indemnity from Travelers for the amounts TT Club paid to fund the Settlement and the amounts TT Club paid in defense of CMA in the

---

provision in the General Release and Agreement. (Doc. 39 at ¶ 39.) The Court notes that the General Release and Agreement expressly allows disclosure of its terms "in connection with discovery or other aspects of litigation," or if required "by a court of competent jurisdiction[.]" (Doc. 30, Attach. 1 at 143.) Because it would be impossible for the Court to explain its ruling without discussing the settlement amount, the Court finds the disclosure was appropriate.

Underlying Lawsuits. (Doc. 12 at ¶¶ 28, 32.) Now, the parties have brought cross-motions for summary judgment on these claims. (Docs. 25, 30.)

## STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56(a) "[a] party may move for summary judgment, identifying each claim or defense— or the part of each claim or defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial[.]' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is material. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553 (quotation marks omitted). The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587–88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586, 106 S. Ct. at 1356 (citations omitted). A mere "scintilla" of evidence or simply conclusory allegations will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933–34 (11th Cir. 1989)(citing Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)).

When a court considers cross-motions for summary judgment, the standard of review "does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." GEBAM, Inc. v. Inv. Realty Series I, LLC, 15 F. Supp. 3d 1311, 1315-16 (N.D. Ga. 2013) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." (quotation omitted)).

## ANALYSIS

The parties advance several arguments in support of their respective motions for summary judgment. In its motion for summary judgment on its petition and TT Club's counterclaims, Travelers argues that the Bumbershoot Policy is a "true umbrella" policy and, therefore, is not reached because the MGL Policy and the TT Club Policy, which are both primary policies, are not exhausted by the Settlement payout. (Doc. 25, Attach. 1 at 13.) Travelers also argues that the Non-Owned Endorsement in the MGL Policy provides true excess coverage, rather than primary coverage with an "other insurance" clause. (Id. at 14-15.) Since the TT Club

9

Policy provides primary coverage to CMA through its Third-Party Clause and Chassis Clause, Travelers argues the MGL Policy is not reached as the Settlement amount is within the limits of the TT Club Policy. (Id. at 16-19.) Alternatively, if the Court finds the policies are co-primary, Travelers argues that the MGL Policy and the TT Club Policy would contribute to the Settlement on a pro-rata basis proportional to their relative policy limits. (Id. at 19-21.) Lastly, Travelers argues that TT Club is not entitled to reimbursement for costs of providing defense to CMA because the services were provided on a voluntary basis. (Id. at 22-24.)

In opposition to Travelers' motion for summary judgment, TT Club argues that Travelers lacks standing to seek declaratory relief because it has already contributed to the Settlement. (Doc. 31 at 8.) Then, in support of its motion for summary judgment on its counterclaims, TT Club argues that the MGL Policy and the Bumbershoot Policy provide an $11,000,000 tower of coverage that must be fully exhausted before the TT Club Policy is reached. (Doc. 30, Attach. 11 at 7-8.) TT Club contends that the Bumbershoot Policy is triggered as soon as the MGL Policy is exhausted and does not require exhaustion of the TT Club Policy. (Id. at 9.) Relying on English law, TT Club contends that the MGL Policy provides coverage for the Settlement before the TT Club Policy due to "escape clauses" contained in the TT Club Policy. (Id. at 10-12.) TT Club also argues that the MGL Policy applies

first under Georgia law because it contains a pro-rata sharing clause absent from the TT Club Policy; provides coverage that more specifically insures the risk that occurred in the Underlying Lawsuits; and insured the truck as a hired/non-owned auto, triggering the "insurance follows the car" rule. (Id. at 13-16.) Finally, TT Club argues that Travelers had an obligation to defend the claims against CMA as their primary insurer and TT Club should be entitled to recoup the costs it incurred defending CMA or, at the very least, be entitled to contribution from Travelers as an equitable matter. (Id. at 17-20.)

Having described the parties' arguments in a general manner, the Court will now explain its rulings on the parties' cross-motions for summary judgment. In its analysis, the Court's answers four distinct questions: first, whether the Court has jurisdiction over Travelers' petition for declaratory relief; second, how Georgia's choice of law principles affect which state's law governs this diversity action; third, what is the priority of coverage between the parties' insurance policies; and fourth, whether TT Club is entitled to contribution for the costs it incurred defending CMA in the Underlying Lawsuits.

I.   WHETHER THE COURT HAS JURISDICTION OVER TRAVELERS' PETITION
     FOR DECLARATORY RELIEF

As a threshold matter, the Court must address TT Club's argument that Travelers lacked standing to pursue declaratory

relief in this case. (Doc. 31 at 8); see Lewis v. Governor of Alabama, 944 F.3d 1287, 1296 (11th Cir. 2019) ("Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting."). In opposing Travelers' motion for summary judgment, TT Club argues that an insurer who has already paid out a claim under its policy lacks standing to pursue a declaration that another insurer should have paid the claim because such relief concerns only past events. (Doc. 31 at 8.) Specifically, TT Club argues that Travelers lacks standing to seek declaratory relief based on its partial payment of the Settlement, which is an injury that has already occurred. (Id.)

"Article III of the United States Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' U.S. Const. Art. III, § 2, and 'the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III[.]' " Hollywood Mobile Ests. Ltd. v. Seminole Tribe of Fla., 641 F.3d 1259, 1264–65 (11th Cir. 2011) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992)). "In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims, and the court is powerless to continue[.]" CAMP Legal Def. Fund, Inc. v. City of

Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (citations and internal quotation marks omitted). "In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." Malowney v. Fed. Collection Deposit Grp., 193 F.3d 1342, 1346 (11th Cir. 1999) (citations omitted). "Injury in the past, however, does not support a finding of an Article III case or controversy when the only relief sought is a declaratory judgment." Id. at 1348 (citing Emory v. Peeler, 756 F.2d 1547, 1552 (11th Cir. 1985).

Although not addressed by either party, mootness is also a threshold question which implicates the Court's jurisdiction. See Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1327 (11th Cir. 2004). Mootness has sometimes been described as "the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)." J.M. v. Crittenden, 337 F.R.D. 434, 451 (N.D. Ga. 2019) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S. Ct. 1202, 1209, 63 L. Ed. 2d 479 (1980)). In other words, the standing inquiry asks whether an Article III controversy existed at the outset of litigation, whereas the mootness inquiry asks

whether that controversy has been maintained throughout the litigation. See Dunn v. Dunn, 148 F. Supp. 3d 1329, 1334 (M.D. Ala. 2015) (citations omitted).

It is clear in this case that Travelers seeks only declaratory relief in its petition.[5] (Doc. 1 at 11-13.) At least one other district court in this circuit has held that declaratory relief concerning the priority of co-insurers' policies is unavailable if the co-insurers have already paid out the underlying claim because such relief "concerns only past events, not future injury." See Hous. Enter. Ins. Co. v. AmTrust Ins. Co. of Kan., 212 F. Supp. 3d 1330, 1338 (N.D. Ga. 2016) (citations omitted). Travelers cites one case in which a court decided a declaratory judgment action where the co-insurers had previously agreed to payout a settlement claim equally, reserving their right to bring their coverage dispute in later litigation. (Doc. 37 at 3-4 (citing Encompass Prop. & Cas. Co. v. Travelers Indem. Co. of Am., No. 1:15-Cv-03564-LMM, 2016 WL 9455013, at *2-3 (N.D. Ga.

---

[5] Travelers contends that it "specifically seeks contribution and/or indemnity from TT Club[,]" citing to paragraph 27 of the petition for declaratory judgment. (Doc. 37 at 5.) In paragraph 27, Travelers simply states that it is "entitled to contribution and/or indemnity from TT Club" but makes no request for monetary relief. (Doc. 1 at ¶ 27.) In contrast, in paragraphs 28 and 29, Travelers clearly requests "that the Court enter **judgment declaring**" that it is entitled to contribution. (Doc. 1 at ¶¶ 28, 29 (emphasis added).) The Court declines to read claims for relief into Travelers' petition, when Travelers, which is represented by counsel, failed to make those claims or move to amend its petition.

Dec. 9, 2016).) The court in Encompass, however, makes no mention of standing or mootness in its order resolving the insurers' summary judgment motions. See AmTrust, 212 F. Supp. 3d at 1338 (rejecting reliance on case in which court "ruled upon declaratory judgment claims even when the insurance loss occurred in the past and was already paid[]" because it did "not analyze the standing ramifications of that decision"). Travelers tries to evade the jurisdictional issue by arguing that it filed its petition for declaratory judgment prior to funding the Settlement. (Doc. 4-5.) The Eleventh Circuit has addressed this exact situation and held that an insurer who waited until after filing its complaint to pay the underlying claim may have had standing "during the brief period following the filing of its complaint[,]" but its declaratory judgment claim became moot as soon as the insurer paid the settlement. Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 609 F. App'x 972, 979 (11th Cir. 2015) (per curiam). Accordingly, even though Travelers likely had standing to bring its petition for declaratory judgment, Travelers' claim was rendered moot as soon as it made payments towards the Settlement. Id.

Because the Court lacks jurisdiction over Travelers' petition, Travelers' motion (Doc. 25) is **DENIED IN PART** to the extent it seeks summary judgment on its petition. Likewise, TT Club's motion (Doc. 30) is **GRANTED IN PART** to the extent it seeks

summary judgment on Travelers' claims for declaratory relief. The Court notes that this decision, while required by constitutional limits on jurisdiction, is of little practical significance because the Court still retains jurisdiction over TT Club's counterclaims. _See_ Pushko v. Klebener, No. 3:05-cv-211-J-25HTS, 2007 WL 8971901, at *4 (M.D. Fla. June 12, 2007) ("Where an independent jurisdictional basis exists for the counterclaims, this Court may properly exercise jurisdiction over the remaining counterclaims." (citing Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992)). Resolution of TT Club's counterclaims for contribution will require the Court to make the same determinations regarding priority of coverage and entitlement to recoupment of attorney's fees that would have been necessary to resolve Travelers' petition for declaratory relief. _See_ Twin City, 609 F. App'x at 979.

## II.  CHOICE OF LAW

Having addressed the jurisdictional issues, the Court must determine the law that governs this dispute. Because the Court is exercising diversity jurisdiction over TT Club's counterclaims (Doc. 12 at 7), the Court applies the substantive law of the state in which it sits. Nova Cas. Co. v. OneBeacon Am. Ins. Co., 603 F. App'x. 898, 900 (11th Cir. 2015) (citing Fioretti v. Mass. Gen. Life Ins. Co., 53 F.3d 1228, 1235 (11th Cir. 1995)). "A state's substantive law includes its conflict-of-law rules." Renaissance

Recovery Sols., LLC v. Monroe Guar. Ins. Co. No. CV 1:14-102, 2017 WL 4018861, at *10 (S.D. Ga. Sept. 12, 2007) (citing Nova Cas. Co., 603 F. App'x at 900). Accordingly, the Court must apply Georgia choice of law principles to determine which state law should govern this dispute. Id. (citation omitted).

To decide which state law applies to the interpretation of a contract, if the "contract contains no choice of law provision, Georgia applies the rule of lex loci contractus." Lima Delta Co. v. Glob. RI-022 Aerospace, Inc., 338 Ga. App. 40, 45, 789 S.E.2d 230, 235 (2016) (quotation omitted). Under this rule, "the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made." Garland v. Advanced Med. Fund, L.P. II, 86 F. Supp. 2d 1195 (quotation and citation omitted). However, Georgia courts also adhere to a unique caveat to their choice of law rules, the presumption of identity rule. Under this rule, application of a foreign state's laws is limited to a foreign state's statutes or cases interpreting statutes. Frank Briscoe Co. v. Ga. Sprinkler Co., 713 F.2d 1500, 1503 (11th Cir. 1983) (first citing White v. Borders, 104 Ga. App. 746, 747, 123 S.E.2d 170, 172-73 (1961); and then citing Budget Rent-A-Car Corp. of Am. v. Fein, 342 F.2d 509, 514-15 (5th Cir. 1965)[6]). Where no

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent

foreign statute is involved, Georgia courts will apply Georgia common law rather than foreign common law. Id. (citations omitted); see also Renaissance, 2017 WL 4018861, at *12 (collecting cases applying the presumption of identity rule).

In this case, the parties agree that the MGL Policy and the Bumbershoot Policy are governed by Georgia law because no statute of Virginia, where the contracts were made, applies in this case. (Doc. 25, Attach. 1 12; Doc. 30, Attach. 11 at 6.) The parties also appear to agree that Georgia rules govern TT Club's equitable right to reimbursement for defense costs, as they cite only Georgia case law on these issues.[7] (See, e.g., Doc. 25, Attach. 1 at 22; Doc. 31 at 21.) Yet, TT Club argues that the terms of the TT Club Policy should be interpreted using English law due to a choice of law provision contained in the policy. (Doc. 31 at 9; Doc. 41 at 6-7.) TT Club argues that the presumption of identity rule is merely an exception to the lex loci contractus rule, which does not apply to contracts that contain a choice of law provision. (Doc. 41 at 6-7.)

---

all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[7] The Court notes that the contribution claims in this case are actually equitable disputes, not contractual disputes, because neither party had a contractual obligation to the other to pay certain amounts towards the Settlement. See Renaissance, 2017 WL 4018861, at *12 ("The only reason this contribution action involves a contract is because the equitable distribution of a common burden requires examining the obligations to which the litigants contractually bound themselves.").

TT Club is correct that "in the absence of contrary public policy, [Georgia] courts normally will enforce a contractual choice of law provision, as **the parties by contract** may stipulate that the laws of another jurisdiction will govern the transaction." Nationwide Logistics, Inc. v. Condor Transp., 270 Ga. App. 277, 280, 606 S.E.2d 319, 322 (2004) (citation omitted) (emphasis added). Travelers, however, was not a party to the TT Club Policy and did not stipulate to the choice of law provision. The Court has found no case in which a Georgia court has bound an insurer to a choice of law provision in a contract that their insured signed with another insurer. This comports with the general rule that "a party who does not sign a contract is not bound to the terms of the contract." Elite Storage Sols., LLC v. Sig Sys., Inc., No. 1:19-cv-03430-SDG, 2020 WL 10056403, at *3 (N.D. Ga. Mar. 20, 2020); see also Roberson v. Seaspan Corp., 521 F. Supp. 3d 1325, 1334 (S.D. Ga. 2021) ("A choice of law clause . . . is a contractual right that cannot ordinarily be invoked by or against a party who did not sign the contract in which the provision appears." (quoting Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151, 1169 (11th Cir. 2009))). A non-signatory can only be bound to such a provision in limited circumstances, Roberson, 521 F. Supp. 3d at 1334, and TT Club has not argued that any of these circumstances are present in this case. As a result, the choice of law provision, by itself, does not mandate that the Court use

English law to interpret the TT Club Policy or resolve the parties' priority dispute.

Furthermore, contrary to TT Club's arguments, the Court finds no support in Georgia law for the proposition that the presumption of identity rule only applies as an exception to the rule of lex loc contractus and, therefore, should not apply when there is a contract contains a choice-of-law provision. (Doc. 41 at 6-7.) Georgia courts have utilized the rule in contract cases, Calhoun v. Cullum's Lumber Mill, Inc., 247 Ga. App. 859, 862-64, 545 S.E.2d 41, 44-46 (2001), and tort cases, White, 104 Ga. App. at 747, 123 S.E.2d at 172-73, indicating the rule is not a limited exception but a general rule that Georgia courts will not apply the law of a foreign state unless a foreign statute governs the dispute in question.[8] Accordingly, because Travelers is not bound by the choice-of-law provision and TT Club has identified no English statute that controls the dispute in this case, the presumption of identity rule applies and compels the Court's conclusion that Georgia common law governs the entirety of this action.

---

[8] The Court is aware that the district court in Renaissance refers to the rule as an "exception to lex loci contractus[.]" 2017 WL 4018861, at *14. While the rule does apply as an exception in contract cases, Georgia case law clearly demonstrates that the rule is not limited to those circumstances.

III. PRIORITY OF COVERAGE

Having determined that Georgia law governs this case, the Court will now explain certain principles of Georgia law that are helpful to understanding the parties' arguments regarding the priority of coverage between their respective insurance policies. In Georgia, "insurance is a matter of contract, and the parties to an insurance policy are bound by its plain and unambiguous terms." Richards v. Hanover Ins. Co., 250 Ga. 613, 614, 299 S.E.2d 561, 563 (1983) (citation omitted). "Under Georgia law, '[a]n insurance contract is governed by the ordinary rules of construction and should be construed to ascertain the intention of the parties. In discovering the intent of the parties, the whole instrument should be considered together, along with the surrounding circumstances.' " Am. Cas. Co. of Reading v. MAG Mut. Ins. Co., 185 F. App'x 921, 925 (11th Cir. 2006) (per curiam) (quoting Progressive Preferred Ins. Co. v. Brown, 261 Ga. 837, 838, 413 S.E.2d 430, 431 (1992)). "[T]he interpretation of an insurance policy . . . is a question of law for the court to decide." Id.

Insurance contracts are often categorized as providing one of two levels of coverage: primary or excess. Renaissance, 2017 WL 4018861, at *14. While "[p]rimary insurance covers an initial level of liability[,] [e]xcess insurance (also known as umbrella insurance) covers losses that exceed an initial level of

liability." Id. In many cases, insurance policies will be written with the intention of providing primary coverage but will include "other insurance" provisions which seek to avoid or limit liability if the insured is covered by another policy. See Renaissance, 2017 WL 4018861, at *14; St. Paul Fire & Marine Ins. Co. v. Valley Forge Ins. Co., No. 1:06-CV-2074-JOF, 2009 WL 789612, at *4 (N.D. Ga. Mar. 23, 2009) ("[T]he insurer may use an excess clause to avoid double payment when the insured has other insurance."). " '[O]ther insurance' clauses come in three forms: 'excess' clauses, 'pro-rata' clauses, and 'escape' clauses." Renaissance, 2017 WL 4018861, at *14; Am. Cas., 185 F. App'x at 924 n.2.

> Excess clauses allow a primary policy to avoid double payment when the insured has other insurance. They do not make the policy an excess policy, but merely provide that an insurer will pay a loss only after other available primary insurance is exhausted. Pro rata clauses, on the other hand, merely allow insurers to lessen their liabilities when the insured has other insurance. A pro rata clause provides that the insurer will pay its share of the loss in the proportion its policy limits relates to the aggregate liability coverage available. Finally, escape clauses allow insurers to escape liability altogether. They provide[] that an insurer is absolved of all liability where other coverage is available.

Renaissance, 2017 WL 4018861, at *14 (internal quotation marks and citations omitted).

In contrast to primary policies, even ones containing "other insurance" clauses, "[a] 'true excess' or 'umbrella' policy is

22

not intended to provide primary coverage and 'expressly provides nothing but excess coverage over and above certain primary coverage.'" <u>St. Paul Fire</u>, 2009 WL 789612, at *4 (quoting <u>Am. Cas.</u>, 185 F. App'x at 927). Therefore, umbrella policies "are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses." <u>Atkinson v. Atkinson</u>, 254 Ga. 70, 77, 326 S.E.2d 206, 214 (1985) (quotation omitted).

In this case, it is undisputed that the Great West policy provided the first level of primary coverage to CMA for the underlying lawsuits. Since the Great West policy has been fully exhausted, the question is which of the parties' policies is first obligated to pay the remainder of the Settlement. To answer this question, the Court will examine the language of the parties' policies to determine what level of coverage each policy provides and whether the policies contain "other insurance" clauses that affect this priority dispute.

A. <u>The MGL Policy</u>

Travelers' MGL Policy provided coverage to CMA from June 4, 2014, through June 5, 2015. (Doc. 25, Attach. 2 at ¶ 14; Doc. 31, Attach. 1 at ¶ 14.) Notwithstanding their dispute about priority of coverage, the Parties agree that the MGL Policy provided coverage for the underlying lawsuits under an endorsement for "Non-Owned and Hired Auto Liability" (the "Non-Owned

Endorsement"). (Doc. 25, Attach. 2 at ¶ 16; Doc. 31, Attach. 1 at

¶ 16; Doc. 12, Attach. 1 at 51.) The MGL Policy contains the

following relevant clauses:

<u>COVERAGE:</u>

In consideration of an Additional Premium of [redacted], it is hereby mutually understood and agreed that coverage under this policy shall be extended to cover the Named Insured's legal liability for "bodily injury" or "property damage" caused by an "accident" resulting from the use of a "non-owned auto" or "hired auto".

However, this endorsement provides coverage only on an excess basis, after any applicable primary coverage has been exhausted.

\* \* \*

<u>LIMITS:</u>

A separate Limit of Liability of $1,000,000 applies to all claims resulting from a single "accident" or series of "accidents" arising out of the same event, including claims, costs, fees and expenses. Additionally, coverage provided under this endorsement is subject to the applicable General Aggregate Limit of Liability set forth in General Conditions Clause 7. This coverage is solely excess of, and not contributing with, any other insurance which may be applicable to a loss covered in this endorsement.

<u>DEDUCTIBLE:</u>

This coverage is subject to the deductible, terms and conditions of the policy to which this endorsement is attached.

(Doc. 12, Attach. 1 at 51.) Under a "General Conditions" section,

the MGL Policy contains the following pro-rata clauses:

14. **OTHER INSURANCE**

The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance . . . .

* * *

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, this Company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(1)   Contribution by Equal Shares:

If all such valid and other insurance provides for contribution by equal shares, this Company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(2)   Contribution by Limit:

If any such other insurance does not provide for contribution by equal shares, this Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

(Doc. 25, Attach. 2 at ¶ 15; Doc. 31, Attach. 1 at ¶ 15; Doc. 12,

Attach. 1 at 22.)

Travelers concedes that the MGL Policy was written to provide

primary coverage but contends that the Non-Owned Endorsement

expressly stated that it "provides coverage only on an excess basis," and therefore, should be treated as a "true excess" policy rather than a primary policy with an "other insurance" clause. (Doc. 25, Attach. 1 at 14-15.) In making this argument, Travelers relies on a case from the Northern District of Georgia, Phoenix Insurance Co. v. Nationwide Property and Casualty Insurance Co., No. 1:12-cv-00660-JOF, 2013 WL 11975142 (N.D. Ga. Apr. 22, 2013). (Doc. 25, Attach. 1 at 15.) Phoenix involved a coverage dispute arising from a golf cart accident at a country club. 2013 WL 11975142, at *1. The plaintiff insured the country club, and the defendant insured the driver of the golf cart. Id. The plaintiff's insurance policy provided coverage to the country club under an endorsement that stated that coverage arising from the use of a golfcart "is excess over any other insurance, whether primary, excess, contingent or on any other basis that provides coverage to the user of the [golfcart]." Id. The court in Phoenix reasoned that because the endorsement did not provide primary coverage for golf cart accidents under any circumstance, it should be treated as providing "true excess" coverage not triggered until the exhaustion of any applicable primary insurance. Id. at *3-4.

　　Decisions of the Eleventh Circuit and the Supreme Court of Georgia cast doubt on extending Phoenix's reasoning to the facts of this case. In American Casualty Co. of Reading v. MAG Mutual Insurance Co., the Eleventh Circuit considered whether an

endorsement containing an excess clause similar to the one in the Non-Owned Endorsement constituted "true excess" coverage. 185 F. App'x at 923, 926-27. The Eleventh Circuit rejected the defendant's arguments that the policy's excess clause showed that it "never intended to act as a primary insurer" with respect to coverage under the relevant endorsement. Id. at 926-27 (finding endorsement did not constitute "true excess" coverage despite clause stating that "[i]nsurance under this coverage is excess of and payable only after all other valid insurance . . . ."). The Eleventh Circuit noted that, notwithstanding the excess clause, the endorsement was not "written like umbrella or 'true' excess coverage, which expressly provides nothing but excess coverage over and above certain primary coverage." Id. (citations omitted). Similarly, in Atkinson v. Atkinson, the Supreme Court of Georgia held that a primary policy did not become a true excess policy by virtue of a provision that stated the policy only provided excess coverage in the event of an accident involving a non-owned vehicle. 254 Ga. at 76-77, 326 S.E.2d at 213-14. The Georgia Supreme Court found that the policy in question was "written to provide primary coverage" and "[o]nly when it [was] called upon where a vehicle not owned by the insured [was] involved [did] it become excess." Id. at 77, 326 S.E.2d at 214.

The court in Phoenix distinguished its policy from the one in American Casualty, reasoning that its policy only provided

coverage for golf cart use on an "excess basis," and was, therefore, materially different from the coverage in American Casualty that began as primary coverage but became excess under certain conditions. 2013 WL 11975142, at *3. The court in Phoenix was also explicit that its case did not involve "the owner/non-owner distinctions in automobile insurance" that influenced the Georgia Supreme Court's decision in Atkinson. Id. (citing Atkinson, 254 Ga. at 77, 326 S.E.2d at 213-214). Even assuming, without deciding, that the court in Phoenix correctly distinguished itself from American Casualty, the Court is not persuaded that the same distinctions exist in the MGL Policy. As stated in the General Conditions section, the MGL Policy provides "primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance." (Doc. 12, Attach. 1 at 22.) The Non-Owned Endorsement is also not written like a "true excess" policy which requires the existence of a primary policy as a condition of coverage; rather, it is "a primary policy that seeks to become excess in the event of other insurance." Am. Cas., 185 F. App'x at 926; see also Encompass 2016 WL 9455013, at *3 (concluding policy was primary because it "did not require the purchase of a primary policy as a condition for coverage.") Further, the excess clause in the MGL Policy is triggered by the same owner/non-owner distinction that the Georgia Supreme Court considered in Atkinson. Atkinson, 254 Ga. at 77, 326 S.E.2d at

214. Accordingly, the Court declines to extend the reasoning of Phoenix to the facts in this case and finds that the MGL Policy is a primary policy that contains an excess clause.

B. The Bumbershoot Policy

Travelers' Bumbershoot Policy also provided coverage to CMA for the June 4, 2014, through June 5, 2015, policy period. (Doc. 25, Attach. 2 at ¶ 19; Doc. 31, Attach. 1 at ¶ 19.) The parties agree that the Bumbershoot Policy is an umbrella or "true excess" policy and provides coverage in excess of the MGL Policy, up to a limit of $10,000,000, subject to a $25,000 self-insured retention. (Doc. 25, Attach. 2 at ¶ 20; Doc. 31, Attach. 1 at ¶ 20; Doc. 12, Attach. 4 at 17.) When triggered, the Bumbershoot Policy will pay the "Ultimate Net Loss" which is defined in the policy.

> The terms Ultimate Net Loss, means the total which the Insured becomes obligated to pay by reason of matters set out in Section I. Insuring Agreement, A.. Coverage, . . . excluding any part of such expenses for which the Insured is covered by other valid and collectible insurance.

(Doc. 12, Attach. 3 at 30.) Because the Bumbershoot policy clearly provides umbrella coverage, it will be "regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses." Atkinson, 254 Ga. at 77, 326 S.E.2d at 214 (citation omitted).

C. <u>The TT Club Policy</u>

Lastly, the TT Club Policy provided coverage to CMA for the January 1, 2014, through September 30, 2015, policy period. The TT Club Policy provides coverage up to a $30,000,000 limit per accident. (Doc. 25, Attach. 2 at ¶ 7; Doc. 31, Attach. 1 at ¶ 7.) Travelers contends that the TT Club Policy provides coverage for the underlying lawsuits pursuant to both its North American Chassis Liability Clause (the "Chassis Clause") and its Third-Party Liabilities Clause (the "Third-Party Clause"). (Doc. 25, Attach. 2 at ¶ 7.) TT Club contends that the Chassis Clause is the only coverage provision applicable to the Underlying Lawsuits. (Doc. 31, Attach. 1 at ¶ 7.)

The relevant portions of the Chassis Clause and the Third-Party Clause are appended below:

NORTH AMERICAN CHASSIS AND LIABILITY CLAUSE

1    You are insured for:

> The following liabilities arising out of an accident in USA/Canada and involving a chassis or trailer for use on public roads which you own or lease

\* \* \*

1.2  Your non-contractual liability for:

1.1.1 Physical loss/damage of third party property

1.1.2 Death Injury or illness of any third party

\* \* \*

3    **Scope of Insurance**

3.1  You are only insured to the extent that liabilities are not insured under other insurances available to you and other parties besides the domestic policy.

\* \* \*

3.3  This insurance:

   3.3.1   does not insure other parties

   3.3.2   is in excess of any sums recoverable from other parties (or their insurers)

   3.3.3   is not automobile or excess automobile liability insurance.

3.4  Other parties means parties other than you involved in the accident, and any owner, lessor, lessee, operator or user of the chassis/trailer (or motor vehicle towing it).

S2 THIRD PARTY LIABILITIES CLAUSE

1    You are insured for:

   Your liability:

1.1  For physical loss/damage of third party property

1.2  For death, injury or illness of any third party

\* \* \*

2    You are not insured under this Clause for liabilities:

\* \* \*

2.5  arising from ownership, lease or operation by you/your employee of a road vehicle which is required to be licensed

2.6  arising from an accident in USA/Canada involving your [owned/leased] chassis/trailer for use on public roads.

(Doc. 20, Attach. 1 at 6-7, 16-17.) Coverage under the TT Club Policy is also subject to the following "Double Insurance" clause:

> 12   **Double Insurance**
> If you are insured by us and another insurer for the same risk, we will exclude any claim to the extent that it is recoverable from the other insurer or would be recoverable except for a double insurance exclusion[.]

(Id. at 37.)

The Court agrees with TT Club that the only provision of the TT Club Policy that provides a basis of coverage for the underlying accidents is the Chassis Clause. (Doc. 31 at 13-14.) The Third-Party Clause explicitly states that the clause does not provide coverage for claims "arising from an accident in USA/Canada involving your* [owned/leased] chassis/trailer for use on public roads." (Doc. 20, Attach. 1 at 17.) Presumably because the Third-Party Clause does not include its own specific "other insurance" clause, Travelers argues that TT Club waived the right to limit its coverage to the Chassis Clause by failing to issue a reservation of rights letter to CMA. (Doc. 25, Attach. 1 at 6, 17.) As TT Club points out, the Georgia Supreme Court has held that the notice requirement imposed on insurers seeking to deny coverage to their insured is inapplicable to disputes between insurers. Nat'l Union Fire Ins. Co. v. Am. Motorists Ins. Co., 269 Ga. 768, 769-770, 504 S.E.2d 673, 674-75 (1998) (finding imposing notice requirement in such a circumstance would be

32

against public policy because it would encourage insurers to delay defending their insured until they had investigated any potential claim for subrogation). Accordingly, the Court finds that TT Club did not waive the right to argue that the TT Club Policy only provided coverage under the Chassis Clause.

The parties both agree that paragraph 3.1 of the Chassis Clause is an "escape clause," which seeks to absolve TT Club of liability in the event of other insurance. (Doc. 31 at 16; Doc. 38 at 13.) Additionally, the Double Insurance clause in the General Qualifications section is another "escape clause" that applies to the entire policy. (Doc. 30, Attach. 11 at 11.) Accordingly, the Court finds that the TT Club Policy is a primary policy subject to escape clauses.

D. <u>Reconciling The Competing Policies</u>

Based on the foregoing, the Court finds that the priority dispute in this case is between an umbrella policy, the Bumbershoot Policy, and two primary policies containing "other insurance" clauses, the MGL Policy and the TT Club Policy. TT Club argues that the Bumbershoot Policy, despite being an umbrella policy, can be triggered prior to the exhaustion of the TT Club Policy based on a theory of vertical exhaustion. (Doc. 31 at 10-11.) However, TT Club concedes that, at the very least, the Bumbershoot Policy is not triggered until the MGL Policy is exhausted. (<u>Id.</u> at 10.) Because the Bumbershoot Policy is not

affected unless the MGL Policy is exhausted, the Court will first consider the priority of coverage between the MGL Policy and the TT Club Policy. See also U.S. Fire Ins. Co. v. Cap. Ford Truck Sales, Inc., 257 Ga. 77, 81, 355 S.E.2d 428, 431 (1987) ("Excess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted.").

When a party is covered by two primary policies for the same occurrence, Georgia courts will use multiple tools to determine which policy must be exhausted first. Some of these methods of analysis are not relevant to facts of this case. See, e.g., Encompass, 2016 WL 9455013, at *4 (finding the "more closely identified with" test applies only in the context of uninsured motorist coverage (citing Progressive Classic Ins. Co. v. Nationwide Mut. Fire Ins. Co., 294 Ga. App. 788, 790, 670 S.E.2d 497, 499 (2008)). In their briefs, the parties have made arguments concerning three tests or rules for resolving priority disputes, the "specific versus general coverage" test, the "insurance follows the car" rule, and the "irreconcilable rule." The Court will address these issues in order.

TT Club contends that under "specific versus general" test, the MGL Policy, which specifically covered automobile liability, should be considered primary over the TT Club Policy, which only tangentially provided coverage for the accident under its Chassis

34

Clause. (Doc. 30, Attach. 11 at 15-16.) In other words, TT Club argues that because the MGL Policy more specifically covered the risk that occurred, an auto accident, it should be required to exhaust first. The "specific versus general" is an antiquated and often disregarded rule that arose in Hartford Steam Boiler Inspection & Insurance Co. v. Cochran Oil Mill & Ginnery Co., 26 Ga. App. 288, 105 S.E. 856 (1921). See S. Home. Ins. Co. v. Willoughby, 124 Ga. App. 162, 164, 182 S.E.2d 910, 913 (1971). Subsequent courts have sought to "confine Hartford to its facts[,]" recognizing "that principles of equity under Georgia law favor pro-rata sharing of losses among primary insurers." AmTrust, 212 F. Supp. 3d at 1342. The Court finds this approach appropriate in this case, where, as Travelers notes, it is not clear that the policies differ widely in terms of the coverage they were intended to provide under the relevant endorsements. (Doc. 38 at 20-21.)

Likewise, the "insurance follows the car" rule also has no bearing on this matter. This rule stands for the simple proposition "that when two policies cover a car accident, and both have an 'other insurance' clause, 'it is usually held that the policy issued to the owner of the vehicle is the primary policy.' " Encompass, 2016 WL 9455013, at *4 (quotation omitted). TT Club, relying on Georgia court cases, contends that this rule also dictates that applicable non-owned auto insurance, in this

case the MGL Policy, becomes primary after exhaustion of the policy issued to the car owner regardless of any other primary coverage that is available. (Doc. 30, Attach. 11 at 14.) As Travelers highlights, the cases TT Club cites simply affirm the general rule that the car owner's policy will be primary in the event of a car accident but say nothing about the priority of coverage between multiple remaining primary policies. (Doc. 38 at `9); see, e.g., Ga. Mut. Ins. Co. v. Rollins, 209 Ga. App. 744, 747, 434 S.E.2d 581, 584 (1993). As a result, the Court does not find that this rule is helpful to resolve the dispute in this case.

Lastly, the parties dispute how the "other insurance" clauses in their respective policies affect the priority of coverage. Travelers contends that under Georgia law the "excess clause" in the MGL Policy and the "escape clauses" in the TT Club Policy cannot be reconciled and cancel each other out. (Doc. 38 at 18.) TT Club avers that the "escape clauses" preclude the TT Club Policy from being considered "other applicable" insurance within the meaning of the "excess clauses" and, therefore, the MGL Policy should provide primary coverage without the "excess clauses" being triggered. (Doc. 30, Attach. 11 at 12.) On this issue, the Court sides with Travelers.

When "two insurance policies covering the same risk both contain 'other insurance' clauses that cannot be reconciled,

36

those clauses cancel each other out and the insurers share in liability pro-rata." Am. Cas., 185 F. App'x at 925 (citations omitted). At least one Georgia court has applied this rule, also known as the "irreconcilable rule," with equal force in a case where one policy contained an "excess clause" and the other contained an "escape clause." Willoughby, 124 Ga. App. at 166, 182 S.E.2d at 914 ("As the excess and escape clauses here are logically irreconcilable, they cancel one another out and have no more effect than as if they were never written.") In this case, the Court finds the "excess clause" in the MGL Policy and the "escape clause" in the TT Club Policy to be mutually repugnant, as both clauses seek "to shift primary liability to the 'other insurance,' that is, the other policy." Am. Cas., 185 F. App'x at 927. The Court cannot enforce the meaning of one policy without distorting the meaning of the other.[9] Thus, the Court finds that the excess and escape clauses are irreconcilable and that the MGL

---

[9] TT Club argues that the clauses can be reconciled because its policy did not trigger the MGL Policy's "excess clause" as the "escape clauses" precluded the TT Club from constituting other applicable insurance. (Doc. 31, Attach. 11 at 12.) TT Club's logic rests on its conclusory assumption that the MGL Policy, despite its "excess clause," did constitute "other insurance" giving effect to the "escape clause" in the TT Club Policy. However, one could just as easily argue that the "excess clause" in the MGL Policy prevented it from being "other insurance" that triggered the "escape clauses" in the TT Club Policy. The circular nature of these arguments demonstrates the difficulty in reconciling these clauses and has been aptly compared to the problem of "deciding which came first, the hen or the egg." Willoughby, 124 Ga. App. at 165, 182 S.E.2d at 913 (quotation omitted).

Policy and the TT Club Policy are appropriately treated as co-primary insurers who should share liability towards the Settlement amount. <u>Willoughby</u>, 124 Ga. App. at 166-67, 182 S.E.2d at 914.

TT Club argues that even if the MGL Policy and the TT Club Policy are deemed co-primary, their contribution to the Settlement should be split on a "50-50" or nominally equal basis. (Doc. 31 at 19.) The Court finds no support in Georgia case law for this proposition. As stated previously, when competing primary policies both contain "other insurance" clauses that cannot be reconciled, the rule is that "insurers share in liability pro-rata." <u>Am. Cas.</u>, 185 F. App'x at 926; <u>see also</u> <u>Willoughby</u>, 124 Ga. App. at 165-66, 182 S.E.2d at 913-14 (explaining preference for pro-rata contribution). Although in some cases this leads to contribution by equal shares, <u>see</u>, <u>e.g.</u>, <u>Am. Cas.</u>, 185 F. App'x at 928 (policies provided identical $1 million coverage limits), "the majority view is that the loss should be shared by the various insurers pro-rata in the proportion that their respective policy limits bear to the entire loss." Stephen Plitt et al., <u>Couch on Insurance</u> § 217: 11 (3d ed. 2021). Following the majority views also accords with the MGL Policy's pro-rata clause. The pro-rata clause expressly states that when "other insurance does not provide for contribution by equal shares," contribution by limits applies. (Doc. 12, Attach.

1 at 22.) The fact that TT Club's policy is silent on the issue of sharing only bolsters the Court's view that the MGL Policy's pro-rata provision should have effect, as it is not irreconcilable with any provision in the TT Club Policy and can be applied as written. See Bradshaw v. St. Paul Fire & Marine Ins. Co., 226 F. Supp. 569, 576-77 (N.D. Ga. 1964) (applying pro-rata contribution by limits where only one policy contained pro-rata clause after deeming both policies' excess clauses mutually repugnant).

TT Club argues that sharing by limits is unfair in this case because it would result in TT Club bearing liability on a 30:1 ratio. (Doc. 31 at 20.) Although this ratio may appear unfair on the surface, it is based on the applicable policy limits that each insurer negotiated with their insured and presumably received fair compensation for providing. Under TT Club's proposed method of sharing liability 50:50, Travelers would be required to pay 100 percent of the MGL Policy's liability limit, while TT Club would be required to pay little more than 8 percent of its bargained for policy limit. The Court does not find TT Club's proposed method to be any more equitable than requiring the insurers to bear the loss in proportion to the liability limits they contracted to provide their insured.

Because the Court is not persuaded that it should deviate from the pro-rata contribution by limits set forth in the MGL Policy, the Court finds that Travelers and TT Club are liable for

the Settlement amount on a 1:30 ratio in accordance with the respective policy limits of the MGL Policy and the TT Club Policy. Based on the Court's calculations, Travelers was responsible for $161,290.32 of the $5,000,000 settlement amount, and TT Club was liable for the remaining $4,838,709.68. Travelers funded $2,500,000 of the Settlement. Therefore, Travelers is entitled to $2,338,709.68 in contribution from TT Club. As a result, Travelers' motion for summary judgment (Doc. 25) is **GRANTED IN PART** on TT Club's counterclaims for contribution for payments made towards the Settlement. TT Club's motion for summary judgment (Doc. 30) is **DENIED IN PART** for the same reason.[10]

IV. <u>COSTS OF DEFENDING CMA IN THE UNDERLYING LAWSUITS</u>

The last issue for the Court to consider is whether TT Club is entitled to contribution for the defense costs it incurred defending CMA in the underlying lawsuits. TT Club argues that Travelers had an obligation to defend CMA in the underlying action and, therefore, Travelers should be required to reimburse TT Club for costs of defense as an equitable matter (Doc. 30, Attach. 11 at 20.) Conversely, Travelers argues that TT Club defended CMA on a voluntary basis, because Great West was the primary insurer, and the "voluntary payment" doctrine precludes TT Club's claims

---

[10] Because the Settlement is fully paid before the MGL Policy is exhausted, the Court need not consider TT Club's arguments that the Bumbershoot Policy could apply prior to full exhaustion of the TT Club Policy.

for contribution. (Doc. 25, Attach. 1 at 22.) The Court finds that Travelers had an obligation to defend CMA in the underlying lawsuit, and TT Club is entitled to contribution for its defense costs on a pro-rata basis.

Travelers is correct that an excess insurer normally has no obligation to provide defense for its insured until underlying primary insurance has been exhausted. (Doc. 38 at 24 (citing Wellons, Inc. v. Lexington Ins. Co., 931 F. Supp. 2d 1228, 1244 (N.D. Ga. 2013).) However, the Georgia Court of Appeals has held that a primary insurer does have an obligation to defend its insured even if its policy contained an excess provision that would make its coverage excess over other insurance issued to a third party but available to the insured. Nat'l Sur. Corp. v. Dunaway, 100 Ga. App. 842, 842-43, 112 S.E.2d 331 (1959) (citations omitted). The cases on which Travelers relies involve true excess policies rather than primary policies containing other insurance provisions. See Wellons, 931 F. Supp. 2d at 1245 ("The **Umbrella Policy** was not triggered, and defendant had no duty to defend or speak to coverage." (emphasis added)). Both the MGL Policy and the TT Club Policy provided coverage to CMA on a primary basis and therefore both insurers owed a duty to defend CMA in the Underlying Lawsuits.

The Court agrees with the court in St. Paul Fire that a primary insurer who undertakes defense of a mutual insured has a

right to seek contribution for defense costs against a co-primary insurer who has refused to participate in the insured's defense. St. Paul Fire, 2009 WL 789612, at *10. The Court also finds that the pro-rata sharing by limits utilized to determine the allocation of the Settlement amount applies equally to the costs of defense. Id. (examining language of policies' pro-rata provisions to determine allocation of defense costs). Accordingly, the Court finds that Travelers and TT Club are responsible for the costs of defense on a 1:30 ratio respectively. TT Club asserts that the total defense costs that should be allocated among the insurers amounts to $405,247.49. (Doc. 31 at 21.) Because Travelers does not object to this calculation, the Court finds that Travelers is responsible for $13,072.50 of this amount. The $13,072.50 will be subtracted from the amount that Travelers is entitled to recoup from TT Club for its overpayment towards the Settlement.

**CONCLUSION**

Based on the foregoing, Travelers' motion for summary judgment (Doc. 25) is **GRANTED IN PART** and **DENIED IN PART,** and TT Club's motion for summary judgment (Doc. 30) is **GRANTED IN PART** and **DENIED IN PART.** As a result, Travelers' Petition for Declaratory Relief (Doc. 1) is **DISMISSED AS MOOT.** Travelers is **GRANTED** summary judgment on TT Club's contribution claims for payments made towards the Settlement, and Travelers is entitled

to contribution of $2,338,709.68 from TT Club for amounts it overpaid towards the Settlement. TT Club is **GRANTED** summary judgment on its contribution claims for its costs of defending CMA in the underlying lawsuits, and TT Club is entitled to contribution of $13,072.50 for Travelers' pro-rata share of the defense costs. Accordingly, Travelers is entitled to judgment in the amount of $2,325,637.18, which is the amount Travelers is entitled to for its funding of the Settlement less the amount TT Club is entitled to for defense costs. Fed. R. Civ. P. 54(c) ("[F]inal judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.") The Clerk of Court is **DIRECTED** to enter **JUDGMENT** in accordance with this order and to **CLOSE** this case.

SO ORDERED this _31st_ day of March 2022.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA